IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 9, 2015 Session

**STATE OF TENNESSEE v. DWAYNE MOORE**

**Appeal from the Criminal Court for Shelby County**
**No. 13-01273     Carolyn Wade Blackett, Judge**

**No. W2014-02432-CCA-R3-CD  -  Filed March 29, 2016**

The defendant, Dwayne Moore, was convicted by a Shelby County jury of second degree murder and sentenced by the trial court as a Range I offender to twenty-two years at 100% in the Department of Correction.  He raises two issues on appeal:  (1) whether the trial court committed reversible error by allowing a police officer to offer improper opinion testimony about the appearance of a gun in a photograph and by admitting the photograph and the gun without a proper chain of custody; and (2) whether the evidence is sufficient to sustain his conviction.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

John Keith Perry, Southaven, Mississippi, for the appellant, Dwayne Moore.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

At approximately 9:50 a.m. on Friday, February 22, 2013, deputies from the Shelby County Sheriff's Department, who were conducting a welfare check on the defendant's stepfather, Jimmy McClain, discovered his dead body lying on his living room floor surrounded by shell casings and bullet fragments. The autopsy revealed that

the victim had been shot seven times and had been dead for at least twenty-four hours. All of the home's doors and windows were locked and there were no signs of a struggle. Evidence uncovered by investigators included: information indicating that the defendant disliked the victim and was motivated to kill him to avenge his mother, who was estranged from the victim; that the defendant had been in possession of the same type of gun as the murder weapon, which was discovered in the home of an associate of the defendant's best friend; that around the time of the murder, a series of purposefully deleted communications had passed back and forth between the defendant and his best friend; that the defendant's best friend had warned the associate in whose home the murder weapon was found to get rid of the gun and not to talk to the police; and that the defendant had confessed to his uncle that he killed the victim because the victim had disrespected his mother. The defendant was subsequently arrested and indicted for the first degree premeditated murder of the victim, was tried before a Shelby County Criminal Court jury, and was convicted of the lesser included offense of second degree murder.

## Trial

The State's first witness at the defendant's June 23-27, 2014 trial was Shelby County Sheriff's Department Deputy Mario Albright, who was dispatched to the victim's Cordova home at approximately 9:53 a.m. on Friday, February 22, 2013, in response to a report from the school resource officer of Ridgeway High School, where the victim was employed as a teacher and coach, that the victim had not shown up for work for the past two days. Deputy Albright testified that he and his partner arrived at the home to find two vehicles in the garage and all the doors and windows to the home locked. He said they looked in the back door and saw a shell casing on the floor beside the couch, received permission from their supervisor to make a forced entry into the home, and entered to find the deceased victim lying on his living room floor with multiple shell casings around him. Deputy Albright identified a number of photographs of the crime scene, including one that showed a pair of sweat pants and a rug that appeared to have been shoved to the side as someone entered the front door.

Dr. Erica Curry, the forensic pathologist who performed the autopsy of the victim's body, testified that the cause of death was multiple gunshot wounds and the manner of death was homicide. The victim had thirteen distant gunshots wounds to his head and torso, which included seven entrance wounds and six exit wounds. The victim was shot in the back of the head, in both sides of his neck, in the shoulder, in the back, and twice in the face, with one of the bullets having lodged in his chin. The victim's toxicology report was negative for the presence of either drugs or alcohol, and there were no wounds to his hands to indicate that he was involved in a struggle. Dr. Curry was able to determine that the victim had been dead for greater than twenty-four hours.

2

The victim's sister, Easter McClain, testified that the victim married the defendant's mother, Carla McClain, in 2001. The witness said she lived with the victim and Carla McClain in the victim's Cordova home from approximately January to May 2007. During that time, Carla McClain made a copy of her key to give to the witness so that she could have her own key. The defendant did not live in the home during that period, but the witness believed that he had possibly lived there earlier and said that he lived there during 2008 after the witness moved out. At the time of the victim's death, however, the victim and Carla McClain had been separated for at least three or four years and the victim lived alone.

The witness testified that the victim told her that Carla McClain and her children, "Tiffany" and the defendant, had threatened to beat him up and that he expressed on numerous occasions his fear of them. She described the victim as "[e]xcessively security conscious" and said that he regularly double-checked the doors and windows to ensure that they were locked. In addition, he would not open his door to "just anybody." When asked to describe a photograph of the interior view of the victim's front door, she said it appeared to her to show the rolled-up towel that the victim regularly kept by the bottom of the door to prevent drafts, along with the rug that was in the entry way, which had both been shoved to the side. The witness testified that the victim had not changed his locks after Carla McClain moved out, despite her having repeatedly urged him to do so.

The witness testified that the last time she spoke with the victim was on Valentine's Day when he took her and their mother out to dinner. She said the victim, who had finally filed for divorce from Carla McClain about ten days earlier, was "very excited" to put that part of his life behind him and was also "very happy" because he was dating someone new.

On cross-examination, the witness acknowledged that she never saw the defendant threatening the victim and that the victim, to her knowledge, never made any complaints to the police about the defendant, although he had filed a police report against the defendant's uncle, with whom he had had an altercation. She was adamant, however, that the victim repeatedly told her that the defendant was threatening him, testifying that the victim even told her that if anything ever happened to him, it would be the defendant, Tiffany,[1] or Tiffany's boyfriend.

Nashville resident Karllotta Pamela Smith testified that she and the victim, a part-time preacher, met through church and had been dating for approximately six months at the time of his death. She said they saw each other two or three times each month but

_____

[1] We refer to the defendant's sister by her first name only, as did the witnesses, because we do not know her last name. We intend no disrespect in doing so.

3

talked with each other several times a day, including each morning before work and each night at bedtime. She stated that she talked to him as usual on the morning of Wednesday, February 20, 2013, received a couple of texts from him throughout the work day, and talked to him again after he got off work. Nothing was out of the ordinary, and he seemed excited about an upcoming game in which his team was playing. At 8:40 p.m., she sent him a text reminding him to send her the address of a mutual friend. Twelve seconds later, he responded "okay" by text. That was the last she ever heard from him.

Ms. Smith testified that about a month before the victim's death, she and the victim took a trip together to Hot Springs, Arkansas, for the Martin Luther King Holiday weekend. Before they left the victim's home on Saturday, the victim had a telephone conversation with Carla McClain about a package addressed to Mrs. McClain that had been delivered to the victim's home. Ms. Smith said that the victim suggested that he and Ms. Smith could deliver the package to Mrs. McClain on their way out of town, but she objected, telling him that she thought it was inappropriate to deliver a package to his ex-wife while in the company of his current girlfriend. She stated that, before they left the victim's home, the victim placed the package on a ledge outside his bedroom where he routinely put his mail. When she and the victim returned to the home on Monday, the package was gone.

Ms. Smith further testified that she had witnessed contentious telephone conversations between the victim and Carla McClain about the defendant. On cross-examination, she acknowledged that she was not aware of any threats that the defendant made toward the victim.

The victim's neighbor, Ronald Nelson, testified that on the evening of February 20, 2013, he was in his dining room when he heard six gunshots at approximately 8:40 p.m. At 8:51 p.m., he called the Shelby County Sheriff's Department's non-emergency number to report the gunshots.

Shelby County Sheriff's Deputy Corey Warren, who was dispatched to the shots fired call at 8:59 p.m., testified that he entered the partially gated neighborhood by accessing the code to the security gates, drove to the home of the complainant, and began patrolling the area but did not see anything suspicious. On cross-examination, he testified that it was possible to reach the neighborhood through a road that was not gated.

Detective Jason Valentine of the Shelby County Sheriff's Department identified various photographs and items of evidence that were introduced as exhibits, including the photograph of the sweatpants and rug that appeared to have been pushed to the side of the victim's front entry. Based on his experimentation with various scenarios of entry, he

4

concluded that the killer "[m]ost likely" entered through the front door in an "abrupt fashion" at a time when no one was standing on the other side of the door, testifying that "if someone were standing there to allow someone in, their weight on the rug would not have allowed the rug to move in the position it was."

Detective Valentine also identified a cell phone that he recovered from Robert Collins on March 5, 2013, and a black handgun that he recovered from the home of Jamarius Cooper on March 18, 2013. He testified that on March 5, 2013, he was conducting surveillance at the home of Robert Collins as he waited for a search warrant to be executed for evidence related to the murder of the victim. He said that Mr. Collins threw a gun in the grass and fled on foot when he and the SWAT team attempted to stop him, was caught after a brief foot chase, and was arrested and taken to jail on firearms and narcotics charges after officers recovered marijuana, pills, and the cell phone from his person. He stated that the gun that Mr. Collins threw into the grass had no connection with the victim's murder.

Detective Valentine testified that his review of phone calls that Mr. Collins made from jail led him to develop Jamarius Cooper as an individual who might be in possession of evidence related to the crime. On March 18, 2013, he executed a search warrant at Mr. Cooper's home and uncovered the black gun in a bag inside Mr. Cooper's bedroom closet. Detective Valentine said that the gun, a Smith and Wesson "Sigma" handgun, had scratch marks consistent with someone having tried to deface the serial number, but he was able to read the number and trace the weapon to a man named Robin Antonio Dixon, who had reported it stolen.

On cross-examination, Detective Valentine acknowledged that he did not find any calls to the defendant during his monitoring of Mr. Cooper's phone calls from the jail.

Detective Allen Beene of the Shelby County Sheriff's Department, the lead detective on the case, testified that investigators were able to track the victim's movements on the night of February 20, 2013, through store receipts discovered in his home and their subsequent review of the store surveillance videos, from which they learned that the victim purchased items from Dick's Sporting Goods at 7:18 p.m. and from Kohl's at 8:04 p.m. The victim was alone in the videos, and neither of the store's cashiers reported seeing anything suspicious. He said the last activity on the victim's phone was the text the victim sent to Ms. Smith at 8:41 p.m.

Detective Beene testified that he first interviewed the defendant on February 22, the day that the victim's body was found. The defendant was not a suspect at the time, as he was simply interviewing various individuals in order to try to "get a baseline of what was going on." The defendant, however, appeared "very nervous" during the interview.

5

As the investigation continued, Detective Beene executed a search warrant at the residence on Goodbar to which the defendant and Mrs. McClain had recently moved. He identified photographs of the defendant's bedroom, including one that showed the defendant's bed and bedspread. He also identified the bedspread itself, which he said he collected at a later point after the discovery of a cell phone photograph of money and a gun lying on top of the bedspread. Finally, he testified that during the course of his investigation, he interviewed a woman named Heather Feemster, who showed him texts that she had exchanged with the defendant on the night of February 20, 2013.

Lieutenant Kevin Helms, supervisor of the Detective Bureau of the Shelby County Sheriff's Department, testified that his initial impression of the crime scene was that the victim had either "just got home and was surprised or had been home and somebody came and surprised him." He said it did not appear to have been a robbery, as the victim still had his wallet and cell phone. In addition, there were no signs of a forced entry, which indicated that "somebody had access to that house." He testified that he investigated the victim's background in an attempt to determine if there was anything in his history to explain the killing. The victim, however, appeared to have been a "very spiritual," "loving," "caring," and family-oriented person with no connection to drugs, domestic violence, or any crime. He also investigated other angles, including a tip he received that the murder may have been related to a controversy involving one of the Ridgeway High School basketball players, but he was able to "squash that issue very quick."

Detective Helms testified that because the killer appeared to have entered through the locked front door, he began interviewing those individuals who had access to the home. He said that the victim's sister, Easter McClain, repeatedly urged him to investigate Carla McClain's children, telling him that the victim had had issues with both of them in the past. He was able to rule out Mrs. McClain's daughter, Tiffany, and Tiffany's boyfriend because their alibis checked out, and Mrs. McClain appeared in her interviews to be sincere in her affection for the victim. The defendant, however, aroused Detective Helms's suspicions by inconsistencies in his statements, which led him to delve deeper into the defendant's background.

Detective Helms testified that he learned from Tiffany that the defendant's best friend, who was as close as a brother, was Robert Collins. He also learned that the defendant had been using Carla McClain's cell phone. Through further investigation, including review of the cell phone company's records, he discovered that the defendant had communicated with Mr. Collins on the cell phone around the time of the victim's death and that the communications had been purposefully deleted from the phone. He, therefore, obtained a warrant for Mr. Collins' cell phone and instructed his detectives to place Mr. Collins under surveillance. When he obtained Mr. Collins' cell phone, he

6

discovered that the communications that had taken place between the defendant and Mr. Collins around the time of the murder had also been purposefully deleted from Mr. Collins' phone.

He was, however, able to recover two photographs from Mr. Collins' phone, which appeared to show a .40 caliber Smith and Wesson Sigma handgun and some money spread out on top of a bed. Detective Helms explained that the photographs caught his attention because the victim was killed with a .40 caliber handgun, and he recognized the bedspread on the bed as the defendant's. He said he was familiar with weapons and could tell that the gun in the photograph looked "like one of the Smith and Wesson Sigma which is a 40 caliber type." He also, however, sent the photograph to their "range," where "they did an analysis and showed that this gun [in the photograph] was a[n] actual 40 caliber Sigma." Following the court's overruling of the defendant's objection to the admission of the photograph, Detective Helms explained at more length why he was able to recognize the gun in the photograph:

Smith is – because I know that gun because they actually got sued because they tried to make their gun look like Glocks. And there was a sue -- the different colors, there's a type of action on it. But anyway, that's -- I was able to recognize it cause I just remember when I used to shoot competition that those guns were supposed to be like a Glock gun. And that was -- and then, you know, we did our research and we sent it to the range just for further verification of that gun.

Detective Helms testified that the time stamp on one of the photographs was within twenty-four hours of the homicide, while the time stamp on the other was January 16, 2013.

Detective Helms testified that when he reviewed Mr. Collins' recorded phone calls from the jail, he found a call placed to an unknown individual in which Mr. Collins, using "street talk" that Detective Helms recognized, advised the individual that the gun he had sold him was "hot" and that he should get rid of it. Specifically, Mr. Collins said in the call that the "pit bull" he had sold the individual was "sick," that he should get rid of it, that he should not talk to the police, and that he would not have set up the deal had he known. Detective Helms testified that he was eventually able to trace the phone number that Mr. Collins called to Jamarius Cooper. When he subsequently executed a search warrant at Mr. Cooper's residence, he found the .40 caliber Smith and Wesson Sigma handgun that had been used in the homicide inside Mr. Cooper's closet. Detective Helms stated that there was no pit bull dog anywhere on the premises.

7

Detective Helms testified that, in the meantime, approximately five days after the victim's body was found, he received a 12:30 a.m. phone call "advis[ing]" him to "call . . . the Crossville Police Department regarding a possible tip on a homicide in Memphis . . . on a basketball coach." In response, he sent two of his detectives to Crossville, where they interviewed the defendant's maternal uncle, Donald Page, and Mr. Page's wife, Sherrye Singh.

Detective Helms testified he was not present for the defendant's first interview with law enforcement but participated in a subsequent interview in which he asked the defendant about his whereabouts at the time of the murder. He identified the audio recording of that interview, which was played for the jury and admitted as an exhibit. He said that the defendant reported that he had gone to the Registry Apartments earlier in the day and "hung out" with a Caucasian man named "Don," started for home sometime between 5:00 and 6:00 p.m. as it was becoming dusk, stopped at the French Rivera Spa for ten minutes to use the restroom, and then went home, where he remained for the rest of the night with his mother. The defendant also reported that he had spoken by phone that evening with his child's mother, who lived near Washington. The defendant never mentioned having talked to Heather Feemster.

Detective Helms testified that he subsequently interviewed Carla McClain, whose account was inconsistent with the defendant's. He, therefore, put Mrs. McClain and the defendant in a room together and recorded their conversation. He identified the audio recording of their March 6, 2013 conversation, which was played for the jury and admitted as an exhibit. Detective Helms agreed that the defendant changed his alibi during his conversation with his mother, responding to her statement that he was not there all night and that he had left by telling her that he "was in the Registry smoking with the white boy."

On cross-examination, Detective Helms acknowledged that Easter McClain never reported any specific threat that the defendant made toward the victim. He also agreed that the defendant's uncle, Donald Page, was the only person that ever reported that the defendant had confessed the crime.

On redirect examination, Detective Helms testified that, in addition to reporting that the defendant had left home on that Wednesday night, Carla McClain also told him that the defendant's girlfriend, Heather Feemster, had come to the house to visit the defendant. He further testified that the defendant's uncle, Donald Page, did not initiate contact with the police, explaining that they learned of him after his wife had gone to the Crossville Police Department to express her concern for her and her husband's safety because her husband's nephew had admitted to killing a basketball coach in Memphis.

Detective Helms said that neither Donald Page nor his wife received any reward for the information they provided.

Detective Roosevelt Twilley of the Memphis Police Department's ICAC or Internet Crimes Against Children's Unit, an expert in computer and cellular telephone analysis, testified that the two photographs recovered from Mr. Collins' cell phone had been taken by the cell phone on February 20, 2013, at 12:54 a.m. and on January 16, 2013, at 2:02 p.m.

Deputy Gary Green of the Cumberland County Sheriff's Department testified that at approximately 11:00 p.m. on February 26, 2013, a frightened woman dressed in pajamas, who asked to remain anonymous, came into the Justice Center asking to speak to the sheriff. When he informed her that the sheriff was not there, she imparted some information about a Memphis homicide to him. She left approximately 45 minutes to an hour later, and he then began searching on the internet to find out if her information was real. When he learned that it was, he contacted Memphis authorities and spoke with Detective Helms. Deputy Green said he was eventually able to discover the woman's identity, and he passed that information along to Detective Helms as well.

The defendant's maternal uncle, Donald Page, who acknowledged prior felony convictions for theft and forgery and that he was currently in the Arkansas Department of Corrections on a parole violation, testified that during the time that he was visiting with his sister in Memphis immediately after the discovery of the victim's body, the defendant told him he needed to talk to him. Mr. Page said that he and the defendant then went outside, where the defendant told him that he "look[ed] out for mama" and that he had "had to handle [his] business." Mr. Page asked the defendant what he meant, and the defendant went on to tell him that the victim and Carla McClain had been discussing divorce, that the victim "got out of line" with Mrs. McClain, that the defendant was not going "to let nobody disrespect her and talk to her . . . the way he did[,]" and repeated that the defendant "had to handle [his] business."

Mr. Page testified that when he asked the defendant if he was trying to say he had something to do with the victim's murder, the defendant "just looked at [him] crazy" without saying anything. At that point, Mr. Page said, he told the defendant that he did not want to hear anything more, that the defendant's uncle would be there tomorrow, and that the defendant could talk to him about it. The defendant started to talk further, saying something about either Wednesday or Thursday night, but he again cut him off, telling him to wait to talk to his uncle.

Mr. Page testified that on February 28, 2013, police officers showed up at his hotel room in Crossville to ask him about the conversation. He identified the audio recording

9

of his statement to police and acknowledged that in that statement, he said the defendant mentioned Wednesday night, rather than Thursday.

On cross-examination, Mr. Page acknowledged that he was not particularly close to the defendant and that it had been five or six years since he had last seen the defendant before his February 2013 visit. He further acknowledged that in his statement to police, he said that the defendant told him during that evening conversation that he had already told his "Uncle Ricky" what he was currently telling Mr. Page. Mr. Page conceded that Gerald Page[2] later confronted him about that part of his statement, telling him that the defendant never said anything like that to him.

Jamarius Cooper testified that sometime in late February 2013, a man he knew as "Pooh," whom he later identified as Robert Collins, called to arrange to sell a gun to him. He said that a man Mr. Collins called "Little Bro" delivered the gun to Mr. Cooper's home in Cordova. Mr. Cooper identified his voice on the recorded telephone call that Mr. Collins made to him from the jail in which Mr. Collins apologized for the sale, saying that if he had known the "pit bull" was "sick," he would not have sold it to Mr. Cooper. Mr. Cooper testified that Mr. Collins was referring to the gun when he mentioned the pit bull. On cross-examination, he testified he identified the defendant to police as a man he was 60 to 70% confident he had seen in the company of Mr. Collins, but he never identified him as the man who delivered the gun to his house because he never saw that man's face.

Heather Feemster, the defendant's former girlfriend, testified that Robert Collins was the defendant's closest friend, whom the defendant regularly referred to as his "big brother," while Mr. Collins regularly referred to the defendant as his "little brother." She said that, because she had not heard from the defendant for a few days, she texted the defendant's mother at 10:00 p.m. on February 20, 2013, to ask if the mother of the defendant's child had heard from him. Ms. Feemster stated that the defendant called her back on his mother's cell phone, and she ended up visiting with him at his mother's home for about thirty minutes to an hour that night. The defendant's mood seemed normal, but he appeared to be in slight pain and favoring one side. In addition, she saw gauze and hydrogen peroxide on his dresser. She asked him what had happened, but he told her not to ask, so they did not discuss that issue any further. When she asked him where he had been, he told her that he had walked from Panola, Mississippi, and that he had gone away because he had to "get a few things off his mind." On cross-examination, Ms. Feemster acknowledged that she said nothing in her first statement to police about the gauze or hydrogen peroxide.

---

[2] "Uncle Ricky" is, apparently, the same person as Gerald Page. Gerald Page is also the uncle with whom the victim had an altercation in 2012.

Robin Dixon, the registered owner of the gun used in the victim's murder, testified that on the morning of December 24, 2012, he discovered that his .40 caliber Smith and Wesson handgun had been stolen from underneath the seat of his locked car, which he had left parked outside his Cordova apartment.

Detective Kevin Helms, recalled by the State, testified that he attempted to interview the defendant's uncle, Gerald Page, but when he told him what Donald Page had said about the defendant, Gerald Page became angry, got up, and left. Detective Helms further testified that during his investigation, he discovered that the defendant had a new cell phone number that he had obtained after February 22, 2013. He said he reviewed the records for that cell phone and learned that it had been in contact with Jamarius Cooper's cell phone at 1:43 p.m. on February 27, 2013. On cross-examination, he acknowledged that he was unable to tell from the phone records who was using the defendant's cell phone when the contact with Mr. Cooper's phone was made.

Tennessee Bureau of Investigation ("TBI") Special Agent Forensic Scientist Lawrence James, an expert in DNA analysis, testified that he found a mixture of DNA from three different individuals on the murder weapon but that none of the profiles matched those of the defendant, Carla McClain, or the victim. He said, however, that his findings did not mean that those individuals had not handled the gun.

TBI Special Agent Forensic Scientist Cervinia Braswell, an expert in firearms identification, testified that all of the cartridge casings found in the victim's home and the bullet recovered from the victim's face were fired from the .40 caliber Smith and Wesson Sigma handgun that was submitted for analysis in the case.

The defendant elected not to testify and rested his case without presenting any evidence. At the conclusion of its deliberations, the jury found the defendant guilty of the lesser offense of second degree murder, and the trial court subsequently sentenced him as a Range I offender to twenty-two years at 100% in the Department of Correction. Following the denial of his motion for new trial, the defendant filed a timely appeal to this court in which he challenges the sufficiency of the convicting evidence and argues that the trial court erred by allowing Detective Helms to offer improper opinion testimony that the gun in the photograph was the murder weapon and by admitting the photograph and the gun itself "without confirming . . . an unbroken chain of custody."

## ANALYSIS

### I. Admission of Evidence Relating to Gun

The defendant first contends that the trial court erred by allowing Detective Helms to offer improper opinion testimony that the gun in the photograph was the murder weapon and by admitting the gun and the photograph into evidence without proof establishing the chain of custody. The State argues that the trial court properly allowed the detective to offer testimony that the gun in the photograph looked similar to the murder weapon and that the defendant has waived any issue regarding chain of custody by his failure to raise the issue at trial. We agree with the State.

Questions concerning the admissibility of evidence generally rest within the sound discretion of the trial court and will not be disturbed absent a showing of an abuse of discretion. See State v. Pylant, 263 S.W.3d 854, 870 (Tenn. 2008) (citations omitted). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or [reaches] a decision which is illogical or unreasonable and causes an injustice to the party complaining." State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006) (citing Howell v. State, 185 S.W.3d 319, 337 (Tenn. 2006)).

## A. Opinion Testimony

The record reflects that the State moved to admit the first photograph of the gun after Detective Helms testified without objection about his recognition of the gun as a .40 caliber Smith and Wesson Sigma. At that point, defense counsel objected, arguing that Detective Helms was unqualified "to validate that this is in fact the same firearm that's over there." Defense counsel pointed out that there was no "40 caliber" mark on the gun and no way for a lay person to tell from just looking at the weapon that it was the same gun. Defense counsel also stated that his problem was with the identification of the gun in the photograph, and not with the bedspread, which he conceded was the defendant's.

The State responded by arguing that whether the gun in the photograph was the same as the murder weapon was a question for the jury and was an issue which the State was attempting to show through the introduction of circumstantial evidence, including that the picture was taken eighteen hours before the murder by Mr. Collins' cell phone and that Mr. Collins, after the murder, sold the murder weapon to Jamarius Cooper. After more discussion, the trial court observed that although neither it nor defense counsel was capable of identifying the gun, Detective Helms might be able to. Defense counsel countered that Detective Helms had just testified that he had to send the photograph to the range for identification and suggested that the photograph should be admitted through the testimony of an expert witness, rather than Detective Helms. The trial court ultimately overruled the objection, stating:

> Well, I think that there's -- Okay. I don't know. I'm not a gun
> expert. I think there's enough people around here that's familiar with that

12

gun can tell what it is. Okay. I think there are enough people that can deduce based upon the real thing as to whether this might have been based upon the facts that he's showing. I think it's a jury question.

We can find no error in the trial court's ruling. Tennessee Rule of Evidence 701(a) provides that a lay witness's "testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). "The distinction between an expert and a non-expert witness is that a non-expert witness's testimony results from a process of reasoning familiar in everyday life and an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field." State v. Brown, 836 S.W.2d 530, 549 (Tenn. 1992).

Citing Detective Helms's testimony that he sent the photograph to the range for identification, the defendant asserts that it was "obvious" that Detective Helms's ability to recognize the gun was based on the "skill and analysis of an expert who was not currently before the court." We respectfully disagree. After the trial court overruled the defendant's objection to the admission of the photograph, Detective Helms went on to explain in greater detail that he was able to recognize the gun in the photograph as a .40 caliber Smith and Wesson Sigma based on his experience in shooting competitions and his familiarity with a lawsuit that Glock had filed against Smith and Wesson over the appearance of the gun and that he sent the photograph to the range only for confirmation.

We agree with the State that Detective Helms's testimony was rationally based on his own experience and perception, and thus, did not constitute improper opinion testimony. See, e.g., State v. Jeffrey D. Allen, No. W2008-01348-CCA-R3-CD, 2009 WL 2502000, at *13 (Tenn. Crim. App. Aug. 17, 2009), perm. app. denied (Tenn. Feb. 22, 2010) (concluding that sheriff's testimony that a scar on defendant's hand was consistent with a scar caused by firing a semi-automatic weapon was not improper opinion testimony because it was rationally based on sheriff's own experience and perception). In our view, the detective's ability to recognize the weapon based on his personal interests and experiences, an ability which other lay persons might not share, is no different from a car fancier's ability to recognize the particular make and model of a vehicle or a dog owner's ability to recognize a particular breed of dog. We also note that the jury was able to compare the photograph to the actual weapon and make its own determinations. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

## B. Chain of Custody

The defendant also argues that the trial court erred by admitting the photograph and the gun itself without a proper chain of custody. However, as the State points out, the defendant did not object to the chain of custody at trial and, thus, has waived the issue on appeal. See Tenn. R. App. P 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Tenn. R. Evid. 103(a)(1) (requiring a timely objection as a prerequisite to a finding of error based on the trial court's admission of evidence).

Regardless of waiver, the defendant would not be entitled to relief on the basis of his issue. Before tangible evidence can be admitted into evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody. State v. Scott, 33 S.W.3d 746, 760 (Tenn. 2000). The chain of custody requirement is "'to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" Id. (quoting State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). Whether or not the required chain of custody has been sufficiently established lies within the sound discretion of the trial court, and the trial court's determination will not be reversed on appeal absent a clear showing of abuse of discretion. State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987).

The record establishes that Detective Valentine identified the gun as the .40 caliber Smith and Wesson handgun that he found in a bag in Jamarius Cooper's closet and testified that he delivered it, along with the other ballistics evidence in the case, to the TBI Laboratory for analysis. TBI Agent Cervinia Braswell, in turn, identified the weapon and the other ballistics evidence as material that had been submitted to her for analysis. The photographs were similarly identified by several detectives, as well as the internet and cell phone expert, as ones that had been retrieved from Mr. Collins' cell phone.

## II. Sufficiency of the Evidence

The defendant next contends that the trial court erred by not granting a directed verdict or, in the alternative, his motion for new trial on the basis that the evidence was insufficient to support the jury's verdict of guilt. Specifically, he argues that without the improper opinion testimony of Detective Helms that linked the murder weapon to the defendant, and discounting the incredible testimony of the defendant's uncle, the jury's guilty verdict "was against the overwhelming weight of the evidence." We respectfully disagree.

14

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant argues that the State's case against him hinged on "two critical pieces of evidence": (1) its ability to link the murder weapon to the photograph of the gun and (2) the testimony of the defendant's uncle, Donald Page, that the defendant confessed the murder. Citing Mr. Page's admission that he did not have a particularly close relationship with the defendant, the defendant argues that his testimony about the defendant's alleged confession is not credible. The defendant also argues that, without Detective Helms's improper opinion testimony, the jury "could only speculate that the gun in the photograph was a .40 caliber."

However, when viewed in the light most favorable to the State, the evidence is sufficient to establish that the defendant committed a knowing killing of the victim. The

State presented a number of circumstantial facts from which the jury could have concluded that the defendant was the perpetrator of the crime, including: evidence that the killer entered through the locked front door, that the defendant had access to a key to the home, that the defendant disliked the victim and told his uncle that he had "had to handle [his] business" because the victim had disrespected his mother during the victim's recent filing for divorce, that a gun similar to the murder weapon was photographed on the defendant's bed less than twenty-four hours before the murder, that the defendant and his best friend had both purposefully deleted the record of the communications that they had exchanged around the time of the murder, and that the defendant's best friend, after the murder, sold the murder weapon to the man in whose home it was ultimately recovered. Whether or not Mr. Page was credible or the gun in the photograph was the murder weapon were issues for the jury to determine. We conclude, therefore, that the evidence is sufficient to sustain the defendant's conviction for second degree murder.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

16